**DEVELOPMENT BANK OF AMERICAN SAMOA, Plaintiff**

**v.**

**HAJ CORPORATION dba POLY IMPEX, ICEWICH FALE, and PEPACO, HANS A. LANGKILDE, W. JOSEPH LANGKILDE, SASA LANGKILDE, and PEPACO, a Sole Proprietorship, Defendants**

---

**W. JOSEPH LANGKILDE, Cross-Claimant**

---

v.

**HAJ CORPORATION dba POLY IMPES, ICEWICH FALE, and PEPACO, and HANS A. LANGKILDE, Cross-Defendants**

---

**HANS A. LANGKILDE, Counterclaimant**

**v.**

**W. JOSEPH LANGKILDE, Counterdefendant**

High Court of American Samoa
Trial Division

CA No. 94-94

November 6, 1996

Before RICHMOND, Associate Justice, VAIVAO, Associate Judge, and ATIULAGI, Associate Judge.

Counsel:     For Plaintiff, Katopau T. Ainuu
             For Defendants Hans A. Langkilde, Sasa Langkilde, and Pepaco, a Sole Proprietorship, Asaua Fuimaono
             For Defendant W. Joseph Langkilde, Barry I. Rose

Opinion and Order:

### Procedural History

On May 26, 1994, plaintiff Development Bank of American Samoa ("DBAS") commenced this action to recover indebtedness to DBAS from defendants HAJ Corporation ("HAJ") dba Poly Impex, Hans A.

Langkilde ("Hans"), and W. Joseph Langkilde ("Joseph"). Hans and Joseph separately answered the complaint, but HAJ neither answered nor otherwise appeared in response to the complaint.

On November 8, 1994, with leave of the court, DBAS filed the first amended complaint, adding Icewich Fale and Pepaco as fictitious names used by HAJ, and defendants Sasa Langkilde ("Sasa") and Pepaco as a sole proprietorship ("Pepaco SP").

On November 17, 1994, Joseph moved for default judgment against HAJ for failure to answer his cross-complaint. We heard this motion on December 28, 1994, and awarded default judgment in Joseph's favor against HAJ on January 3, 1995.

On December 13, 1994, DBAS moved for default judgment against HAJ, Hans, Sasa, and Pepaco SP for failure to answer the first amended complaint. Since Sasa and Pepaco SP answered the first amended complaint on January 26, 1995, DBAS pursued default at the hearing on January 27, 1995, on the motion only against HAJ and Hans.

On March 9, 1995, we awarded DBAS default judgment against HAJ in the principal amount of $68,497.87, plus prejudgment interest, costs, and reasonable attorney's fees. However, at the January 27 hearing, we declined to default Hans, since his answer to the initial complaint was fundamentally responsive to the amended complaint, but directed him to answer the amended complaint. When he failed to answer by March 9, we gave him a deadline of March 17, 1995. Hans answered the amended complaint on March 16, 1995.

On September 29, 1995, we separated trial of the cross-complaint and counterclaim, pursuant to the parties' stipulation. The original action on the amended complaint then came regularly for trial on February 8 and 9, 1996, to determine Hans' and Joseph's individual liability for HAJ's adjudicated indebtedness. Hans, Joseph, and all counsel were present. We took the matter under advisement, considered the evidence, and make the following findings, conclusions, and order.

## Findings of Fact

The parties stipulated that although HAJ once did business as Pepaco, Sasa took over this particular activity, but it no longer operates. DBAS also indicated that it would not presently proceed with its claim against Sasa and Pepaco SP. Hence, given HAJ's default on DBAS's claim, we must only determine the responsibility, if any, that Hans or Joseph has, or both of them have, in their individual capacities, for HAJ's debt to DBAS. Essentially, the issues turn on the interpretation and application

of the documents signed by DBAS, Hans, and Joseph during the course and conduct of HAJ's business operations.

1. HAJ's corporate history.

First, however, we will briefly review HAJ's history. We take judicial notice of *RFD Produce v. HAJ*, CA No. 116-93 at 2-3 (Trial Div. July 28, 1995)(order permanently staying execution against vehicle) for some facts relevant to this purpose.

HAJ was incorporated in American Samoa in 1983. It has engaged in several businesses under the fictitious names Poly Impex, Icewich Fale, and Pepaco. As Poly Impex, HAJ principally imported and wholesaled food and related items. As Icewich Fale, it operated a restaurant. As Pepaco, it primarily imported and wholesaled paper products.

The incorporators, shareholders, and officers were three brothers, Hans as president, Joseph as vice president, and J. Anthony Langkilde ("Anthony") as secretary/treasurer. Until 1988, all three brothers were involved in daily corporate concerns. The shares were informally divided, without written agreement or stock certificates, among Hans, 40%, Joseph, 20%, and Anthony, 40%. In 1988, Anthony left HAJ and, by written agreement signed by him and Hans, surrendered his ownership interest in exchange for extinguishment of his indebtedness to the corporation. Hans and Joseph retained their respective officer roles and remained active in daily corporate affairs. The shares, again informally, were equally redivided between Hans and Joseph.

In 1990, however, Hans became the general manager of the Rainmaker Hotel. Although Hans remained a principal, Joseph carried on most corporate matters until 1993. However, by letter to Hans, dated February 9, 1993, Joseph resigned from HAJ. Hans tried to continue HAJ's businesses, but eventually the businesses lost their vitality and are now defunct.

2. HAJ dealings with DBAS.

On December 19, 1990, pursuant to a corporate borrowing resolution, HAJ, represented by Hans and Joseph, obtained a revolving line of credit with DBAS up to $100,000 exclusively for inventory purchase. A promissory note was to evidence each advance of funds, due and payable in full in 90 days, plus interest, computed daily on the unpaid balance at the lesser of the maximum lawful rate or the prime rate for commercial loans published in the *Wall Street Journal* plus 3%. All advances and accrued interest were to be paid in full when the agreement terminated on November 15, 1991.

On December 19, 1990, HAJ, by Hans and Joseph, also signed a security agreement with DBAS, pledging equipment, inventory, and receivables as collateral for the line of credit. Additionally, Hans and Joseph signed a continuing guaranty, under which they were personally responsible for HAJ's timely payments of the line of credit and future debts, and jointly and severally liable for all or any part of these debts in the event of HAJ's default. DBAS agreed to extend or continue the line of credit and other financial arrangements to HAJ in consideration of receiving the guaranty.

The court has not been provided with any detailed history of HAJ's dealings with DBAS from December 19, 1990, until February 19, 1992, when Joseph wrote on HAJ's behalf to DBAS, and February 24, 1992, when DBAS responded. DBAS then granted HAJ's request to extend the period of HAJ's repayment of the outstanding line of credit obligation and to permit further line of credit advances, apparently for 60 days, while DBAS was considering renewal of the line of credit.

The next activity in evidence was HAJ's request, by Joseph, to DBAS on May 18, 1992, to "roll over" $13,500, presumably HAJ's then current debt to DBAS. Then three line of credit draws followed, represented by HAJ's promissory notes, two dated September 1, 1992, in the principal amounts of $30,517 and $12,185.72, and the third dated September 28, 1992, in the principal amount of $25,699.15. Each note included interest at 12%, pursuant to the prime rate plus 3% formula, and was payable in full approximately 90 days later. Hans and Joseph signed the three notes on HAJ's behalf. They also signed the second note in their individual capacities. It is the sum of these notes, $68,399.87, which DBAS claimed in this action as the principal amount owed to it.

In January 1993, and a second time in early February 1993, DBAS notified HAJ, through Joseph, of the nonpayment of the notes for these three advances. Then, on February 9, 1993, Joseph resigned from HAJ. His resignation letter also unilaterally disclaimed "any debts incurred by HAJ Corp." He simultaneously notified DBAS, Amerika Samoa Bank, and the Bank of Hawaii of his resignation and liability disclaimer. Hans, by letter actually dated February 8, 1993, also advised DBAS of the resignation and Joseph's withdrawn authority to act on HAJ's behalf.

On March 5, 1993, Hans again wrote to DBAS and, expressing reliance on the line of credit and confidence in HAJ's business future, asked to work out a way to continue the line of credit arrangement. On May 20, DBAS responded by entering a new line of credit agreement, substantially the same as the 1990 agreement, but signed only by Hans

on HAJ's behalf. Although April 6, 1993 is the stipulated termination date, April 6, 1994 actually defined the intended life of this agreement.

On May 26, 1994, when the three notes remained unpaid, DBAS commenced this action. On August 16, 1994, Joseph's counsel advised DBAS that it could obtain a prejudgment attachment on HAJ's assets without posting a bond and that Joseph was prepared to provide a list of those assets. Joseph did prepare a list of HAJ's assets as of January 23, 1993. A writ of attachment was issued on January 13, 1995, but no property was successfully levied.

The line of credit agreement, continuing guaranty, and three promissory notes entitle DBAS to recover attorney's fees and collection costs in the event of default.

### Discussion

The central issue in this case is the validity and scope of the continuing guaranty signed by Hans and Joseph. Neither has asserted that the guaranty was invalid *ab initio*. Rather, both argue that the guaranty expired on November 15, 1991, with the initial line of credit agreement. Joseph also argues that his letter of resignation effectively absolved him of any personal liability on the debts. Finally, both Hans and Joseph assert the defenses of laches and unclean hands based upon DBAS's failure to timely obtain a writ of attachment on assets of the now defunct HAJ Corporation.

First. we note that a guaranty is a contract and the rights of guarantors must be determined from the language of the contract. *See, U.S. v. Little Joe Trawlers, Inc.*, 776 F.2d 1249,1254 (5th Cir. 1985). Thus, we will look to the plain language of the continuing guaranty to determine the rights of Hans and Joseph.

### 1.     Future Liability

On the question of future liability, the continuing guaranty is unambiguous. It states that the "liability under this Guaranty is continuing" and mentions nothing about the coterminality of the guaranty with the initial line of credit agreement. Indeed, the very title of the agreement contains this indication. We find no reason to second guess this plain and unambiguous language.

The guaranty does set forth ways to limit future liability, including written notice to DBAS that the guarantor is ending his future liability. Joseph's letter of February 9, 1993, effectively limited his liability at that time. However, as the guaranty makes clear, that written notice had no

effect on the liability that existed prior to that date. Since the debts at issue were all incurred prior to Joseph's letter, his notice has no effect on the outcome of our decision.

## 2.   Laches and Unclean Hands

■   A guaranty of payment, unlike a guaranty of collection, is an absolute promise by the guarantor to pay the debt, when due, if it is not paid by the borrower. Upon the borrower's default, the guaranty of payment enables the creditor to collect debt from the guarantor without seeking collection from the borrower. *See e.g.* 38 AM. JUR. 2D *Guaranty* § 112 (1968); *Phillips Factors Corp. v. Harbor Lane of Pensacola, Inc.*, 648 F. Supp. 1580, 1583-84 (M.D.N.C. 1986).

The continuing guaranty is also unambiguous on the issue of principal liability. It sets forth the liability of Hans and Joseph as "primary, absolute and unconditional." It is quite clearly a guaranty of payment. Indeed the guaranty specifically waives the right of Hans and Joseph to require the DBAS to "take action against the Borrower or any other person or entity, or foreclose upon, sell or dispose of any collateral, before collecting the indebtedness from me."

The arguments by Hans and Joseph based on the defense of laches and unclean hands, therefore, lack merit. If DBAS is not required to take <u>any</u> action to collect the debt from the borrower, it surely has no affirmative duty to timely pursue a writ of attachment on HAJ's assets.

### Conclusion

Based on the foregoing we find Hans and Joseph personally liable to DBAS, under their continuing guaranty, in the principal amount of $68,497.87, accumulated interest as of November 4, 1994 of $13,436.54 and continuing interest of $17.12 from November 4, 1994 to the date this judgment is entered. DBAS is also awarded collection costs and reasonable attorneys' fees, and shall submit a schedule of these costs and fees for the court's approval.

It is so ordered.